## THE STATE *vs.* JOHN FOX.

1. It does not constitute a good cause of challenge to a juror, that he has formed and expressed an opinion of the guilt of the prisoner, founded on his knowledge of the facts, or upon information supposed to be true. A declaration of opinion, to disqualify a juror, must be such a one as implies malice or ill will against the prisoner.

2. The juror challenged may be examined as a witness to prove the alleged cause of challenge, though it tend to his own disgrace. The rule of the common law, in this respect, is altered by the act concerning evidence, approved April 5, 1855.

3. If the defendant offer to swear a competent witness, and to propound to him a specified question which is in itself immaterial, and the court overrule the offer, it is no error.

4. Under the provisions of the act, approved April 3, 1855, which authorizes bills of exceptions in capital cases, a judgment given upon an indictment will not be reversed for any error, except such as may have prejudiced the defendant in his defence upon the merits

5. A variance between the indictment and the evidence, as to the instrumental cause of death, is not material, provided the party is proved to have died the same kind of death as that charged in the indictment. If the indictment charged that the defendant gave the mortal wound with a knife or razor, and it appear in evidence that he gave the wound with a sword, staff, or dagger, the defendant should be convicted.

6. The conduct of the cause, including the general course of the examination of witnesses, rests very much in the sound discretion of the court, and does not constitute a ground of error.

7. When the statements of third persons to a witness are admitted in evi

dence, not to prove the truth of the fact stated, but to show what it was that called the attention of the witness to a fact stated by her, or that fixed the fact in her recollection, such statements are not *hearsay*, within the proper meaning of that term, but are original and independent facts, and therefore admissible in evidence.

This cause came before the court by writ of error, to remove to this court the judgment of the Court of Oyer and Terminer and General Jail Delivery in and for the county of Middlesex.

The following bills of exception were sealed by the judges of the said Court of Oyer and Terminer, on the trial before the said court of the indictment herein after mentioned, to wit:

Court of Oyer and Terminer and General Jail Delivery in and for the county of Middlesex, of the term of April, in the year of our Lord one thousand eight hundred and fifty-six.

The State *v*. John Fox.—Indictment for the murder of John Henry, on the 27th day of December, 1855.

The attorney for the state, George A. Vroom, esquire, having moved this cause before the said court, to wit, Peter Vredenburgh, esquire, one of the justices of the Supreme Court of New Jersey, and Abraham P. Provost, Bethuel Ward, and James C. Goble, esquires, judges of the Court of Common Pleas in and for the said county of Middlesex, on the twelfth day of May, as yet of the term of April, A. D. 1856, of the said court, the prisoner having been placed at the bar, and the court having ordered a jury to be returned in said cause, whereupon

John Gordon was called as a juror in the said cause, who, after he was called, and before he was sworn as a juror in the said cause, was challenged by the said defendant, then and there present in court, for that he, the said John Gordon, had prejudged this cause. Whereupon the said defendant proposed to have the said John Gordon

sworn, and to put the following question to the said John Gordon: "Have you formed and expressed an opinion of the guilt of the prisoner at the bar of the crime with which he stands charged in this indictment."

. To which offer the said attorney for the state excepted, and the court overruled the same, and refused to allow the same, and the said John Gordon was thereupon sworn as a juror in the said cause. To which said decision of the court the said defendant excepted, and prayed a bill of exceptions, and it is allowed and sealed accordingly.

The same challenge was made, question put, ruling made, and exception taken, to each of the first seven jurors in said cause, as they were severally called and sworn in the said cause, and before they were severally sworn therein. Whereupon Ellis Waite was called, as the eighth juror in the said cause, who, after he was called and before he was sworn as a juror in the said cause, was challenged to the favor by the said defendant, then and there present in court; whereupon John Gordon and David Bloomfield, the two first jurors, sworn as such in the said cause, were sworn by the court as triers, to try whether the said Ellis Waite stood indifferent between the parties to the said suit: whereupon the said defendant proposed to have the said Ellis Waite sworn, and to put the following question to the said Ellis Waite : "Have you formed or expressed an opinion of the guilt of the prisoner at the bar of the crime charged in the indictment." To which offer the said attorney for the state excepted, and the court overruled the same, and refused to allow the same.

And no other evidence being then and there offered on the part of the said defendant, the said triers did find that the said Ellis Waite was then and there indifferent between the said parties, and a competent juror, and the said Ellis Waite was thereupon sworn as a juror in the

said cause. To which decision and ruling of the said court the said defendant excepted, and prayed a bill of exceptions, and it is allowed and sealed accordingly.

The same challenge was made, triers sworn, the same examination was proposed of and question put to each juror by the said defendant, and the same ruling of the court. made, and exception thereto taken and allowed, as each of the four last jurors was called and severally sworn in the said cause, and before such juror was sworn therein.

Dr. Clifford Morrogh, a. witness produced, sworn, and examined on the part. of the state, says : I reside in this town ; am a practising physician and surgeon, have been such for a number of years. Examined the body of Henry December 31st last; the first examination I made when the body was in the coffin in the city hall ; the other examination I made at Bennett's hotel. At the last examination the body was free from putrefaction, flaccid, marked with powder. *Question.* Did you examine the body, and what was its appearance ? [Question excepted to, except as to throat.] Found powder under the skin diffused over the face. Over each temple there was a circular contused wound of the form of a ring, just such a wound as would be inflicted by the muzzle of a gun or pistol ; both margins of the wound, inner and outer, were sharp and well defined. There was a wound over the right cheek bone, forming a semicircle, evidently made with the same instrument ; it must have been struck obliquely ; two cuts incised, one on upper part of the forehead, another a little further back towards the vertex of the head ; sharp cuts extending to the skull, short cuts, also a contusion on the left side of the forehead ; a cross cut inflicted in the contusion after death. Two short cuts below the inner angle of the left eye. There was a gash, four or five inches in length, from about one inch beneath the angle of the lower jaw to a corresponding part on the

other side of the neck. It was immediately beneath the tongue bone, and extending, through all the structures, to the back of the gullet; is severed the front wall of the gullet, but the back part was not wounded. The jugular vein was cut, but not severed; two large arteries were also severed on that side. On the right side three arteries were cut, and the external carotid artery among them. I next examined the brain, the interior of the head. The flesh under the circular wounds on the outside of the skull was much extravasated with blood; I mean the temporal muscles. The skull was not fractured; I found no serious injury of the brain. On the surface of the brain, under the right circular wound there was a slight effusion of blood, such as is often found when a person dies from the effects of a stun or concussion, except that the brain was quite healthy and not injured. I formed the opinion that the man had been dead about three days when I saw him on the 31st.

The effect of such a wound on the throat would be, that the man would die very quickly from hemorrhage; the blood might trickle in the windpipe, and the man would strangle; death would result, either way, in a few minutes. The wounds on the throat must have been made with a sharp instrument, such as a knife or razor, from the appearance; the cut was clean, and not jagged.

The defendant, by his counsel, here moved the court that all the testimony of this witness in reference to wounds upon the person of the deceased, except the wound upon the throat of the deceased, be overruled. To which motion the counsel for the state objected, and the court thereupon refused the motion, and refused to overrule the said testimony, or any part thereof. To which decision and ruling of the court the defendant excepted, and prayed a bill of exceptions, and it is allowed and sealed accordingly

Cross-examined.—The first time I saw him was Sunday, the 30th December; that was at night, and I made no particular examination under the gas light. I formed an opinion then that he had been dead about three days. I was examined before the coroner's inquest. I may have said before the coroner's inquest that deceased may have been dead at least twenty-four hours; my opinion was that the body had been dead between twenty-four hours and three days ; that is what I mean to be understood now. After the snow had fallen, the snow would have protected the body from freezing, if not frozen previously. I examined the legs externally, and they were not frozen.

Direct examination.—Did you make a measurement of the circular wounds you have described ? *Answer.* Yes. [Excepted to.] If you have the measurement with you, please produce it. The measurement and model thereof here produced and offered in evidence. To the reception of this model and measurement in evidence, the defendant excepted ; but the court overruled the exception, and admitted the same in evidence. To which the decision and ruling of the court the defendant excepted, and prayed a bill of exceptions, and it is allowed and sealed accordingly.

Matilda Spencer, a witness produced, sworn and examined on the part of the state, says : Last December, I lived in New York. My parents reside at Weston's mills, New Brunswick; I visit them sometimes ; I visited them during the month of December last ; I forgot what day of the month it was I came ; I think it was the third week ; I remained with them rather more than a week ; I had occasion to go to New Brunswick for the purpose of shopping; I went on Thursday, the 27th of December. After I finished my shopping, I returned home by the Old Bridge road ; a part of that road is a plank road, and it was by that road. I was walking along the path under the cedar trees, the left from Brunswick. I was walking in the direction the path led, and my attention was

arrested by something the other side of the road for one moment. And, on looking in the same direction again, I saw a man coming towards me; he was very respectably dressed in dark clothes, and appeared to be intoxicated. I left the path, and went into the road, and, when a short distance past him, I turned to look at him, and he had partly turned, and was looking towards me. He was apparently much agitated; I have stated the facts. I know where there is a wire fence comes up from the river to the plank road; I was this side of the wire fence, running down to the river; I was nearly twenty yards this side, perhaps more. My attention was called to the right for about two minutes. The path was plain and open before me, so that I could see an object upon it; I could see as far as Agnew's house on the hill. At the time my attention was called off, there was no person in this path, nor in the road, in view. When I first saw this man, he was a few rods from the place where the wire fence comes up to the road nearest to the town; he was on the left-hand side as you go to Weston's mills, same path; he approached me to within three or four yards before I left the path. I went towards home; I went to Weston's mills, in Weston's house, where my parents lived. It was between twenty and twenty-five minutes past ten o'clock when I reached home; I cannot fix the time by any other way than what my sister said; my sister remarked I had been very quick, and that made me look at the clock.

The counsel for the defendant here objected to the reception of the conversation of the said witness with her said sister as evidence in this cause, and moved the court to overrule the same.

The counsel for the state objected, and the court thereupon admitted the said conversation in evidence, and refused to overrule the same. To which decision and ruling of the court the defendant excepted, and prayed a bill of exceptions, and it is allowed and sealed accordingly.

State *v.* Fox.

I fix the time by having noticed the clock. It was that hour by the clock. As he was coming towards me, he appeared to be intoxicated, and that attracted my attention, he reeled like a drunken man, as if from the effects of liquor; he was very pale; I noticed he was dressed very respectably; I have seen that man since; I saw him first at the jail after that; I saw him the next Friday week; I think it was the 4th of January; I believe it was Saturday, the 5th; I came from New York on the 4th; I saw him at the jailor's house, in the parlor; it was in the morning. Only one person went in the room with me, a lady from the hotel where I was staying; the room was empty when we went in. I was joined afterwards by several persons; Mr. Vroom and the jailor came in first; Mr. Vroom sat down by my side. There were about eleven men entered the room; they stood; they had their hats and caps off; I recognized one among the last of the num ber as the man I had met on the road; there were two or three others came in after him. He stood a short distance from the door; the door was on his right; they remained in the room, I suppose, four or five minutes; they then left. I designated, after they had gone, how I had recognised this man. I pointed him out to Mr. Vroom and Mr. Jenkins; I don't know of any others. The sheriff was there; I described to Mr. Vroom his dress, and went and stood in the same place that he did. The way I described him, I said he had a large overcoat on, and his cap in his hand. I have seen that man since in this court house; he is present now; it is the man sitting beside Mr. Schenck; it is the same man I saw in the sheriff's room, and also on the plank road.

The witness being cross-examined, says—I believe it was Saturday before Christmas day I came from New York to visit my parents. I was in the habit of coming to Brunswick; in the habit of walking; in the habit of coming for the purpose of shopping. I had not been to

Brunswick before this day. I remained home eight or nine days. I returned Monday after Christmas. I made no memorandum of the time I visited Brunswick. To the question, when was your attention first called to the fact of meeting the man referred to by you, the witness answers—My attention was first called to the matter by being sent for to Brunswick by Mr. Jenkins. I first saw it in the papers; I think it was the "New York Daily Times;" I think this was the following Tuesday. I heard of it from a neighbor before I left Brunswick, but I did not know that I knew about the affair. Mr. Jenkins came for me in New York city on Friday, the 4th of January. What I heard in Brunswick did not call my attention to the fact of being in Brunswick on that day and meeting that man. What I saw in the "Times" called my attention to the fact of having been to Brunswick that day, and meeting that man, and I mentioned it. That was the first my attention was called to this fact. I remember it was Thursday I went to Brunswick shopping; I rely entirely upon my recollection. I can't say exactly how far I had passed him before I looked around, but I should suppose it was ten yards; I was in the middle of the plank road. When I looked at him I turned very nearly, if not quite around; I continued walking. He turned only partly round; he did not stop walking; he was walking pretty fast; I was walking fast; I was not at all alarmed. It is the first house this side of the bridge, on the right hand side as you go down. From where I turned around to look at the man to the house is nearly half a mile. I walked fast from that place to my house; I did not walk faster than before I had passed him; I was not in the least agitated.

Jenkins called on me in Cannon street; that was where I worked. I boarded in Hester street; I boarded with a Mrs. Cavoon; I have not boarded with her ever since; I have resided since with the Henrys; the father of John

State *v.* Fox.

Henry. I don't know whether I shall live there when I return; I have lived with that family up to this time; I went to live with them the next Tuesday after I came to Brunswick; the next Tuesday after the jail transaction I went to live with the Henrys; I never knew that family before or any member of it. I visited Green Point with a daughter of Mr. Henry; I came from New York with the family on this occasion; I have been staying with them while here, at the same hotel.

The witness being again examined in chief, says—It was after I saw the defendant in the jail that I became acquainted with the Henrys. I am a vest maker, and that is what I was doing in Cannon street. Mrs. Henry asked me to go and stay a few days. I thought I had better leave my boarding house, and they heard of it, and asked me to stay those few days until I engaged another; I went on that invitation. Mr. Henry was very sick, and I stayed until I stayed so long I thought I might as well stay until my services were needed here. I did not feel safe at my boarding house; I took my personal safety into consideration in remaining at Henry's. When I read the article in the "Times," I remembered the fact of meeting a man on the plank road, and I also remembered the time.

*Question.* What particular feature in the affair did the neighbor call your attention to before you left New Brunswick?

*Answer.* She said, perhaps the man I met on Thursday morning might have had something to do with it.

The counsel for the defendant here objected to the reception, as evidence in this cause, of the said conversation of the said witness with the said neighbor, and the remark of the said neighbor to the said witness, and moved to overrule the same.

To which the counsel for the state objected.

The court thereupon admitted the said conversation and remark in evidence, and refused to overrule the same.

To which decision and ruling of the court the defendant excepted, and prayed a bill of exceptions, and it is allowed and sealed accordingly.

And thereupon the following errors were assigned in this court, to wit:

And now at this day, to wit, the seventeenth day of June, in the term of June, in the year of our Lord one thousand eight hundred and fifty-six, before the justices of the Supreme Court of Judicature of the state of New Jersey, at Trenton, comes the said John Fox, by Abraham V. Schenck, his attorney, and says, that in the record and proceedings aforesaid, and also in the rendition of the judgment aforesaid, there is manifest error in this, to wit, that it appears, by the record aforesaid, that the judgment aforesaid is given for the said state of New Jersey, and against the said John Fox, when, by the law of the land, the judgment aforesaid ought to have been given for the said John Fox: and in that it is manifestly erroneous.

There is also error in this, to wit, that the crimes in and by the indictment aforesaid against the said John Fox charged are, by the law of the land, uncertainly, doubtfully, and too generally alleged, and that the said indictment supposes, and on the same John Fox charges and imposes crimes, in a different manner and entirely in themselves disagreeing, and that the judgment thereon given is contrary to the law of the land, and not to be pronounced or set for or upon such crimes as in the indictment aforesaid are supposed: and in that it is manifestly erroneous.

And the said John Fox, by his attorney aforesaid, further in fact says, that the said Court of Oyer and Terminer and General Jail Delivery, held at New Brunswick aforesaid, in and for the county of Middlesex aforesaid, to wit, on the twelfth day of May, in the year of our Lord one thousand eight hundred and fifty-six, before the judges of the said court, in the record aforesaid above mentioned,

on the trial of the indictment aforesaid, in the record aforesaid set forth, certain exceptions on the behalf of the said John Fox, by his counsel, were taken and made to the decision and opinion of the said court, by the said judges then and there pronounced and declared, by which opinion the said judges then and there declared, pronounced, and decided that John Gordon, a person then and there called as a juror for the trial of the said indictment, and who, after he was called, and before he was sworn as such juror, was challenged by the said John Fox, then and there present in court, for that the said John Gordon had prejudged the said cause, could not be then and there sworn and examined by the said John Fox in reference to the indifference of the said John Gordon in the said cause, although the said John Fox then and there proposed to, and offered the said court to have the said John Gordon sworn, and to put the following question to the said John Gordon : " Have you formed and expressed an opinion of the guilt of the prisoner at the bar of the crime with which he stands charged in this indictment ;" and the said judges did then and there refuse to allow the said John Gordon to be sworn, and did then and there refuse to allow the said question to be put to the said John Gordon, and the said John Gordon was thereupon then and there sworn and empannelled as a juror for the trial of the said indictment, and issue joined thereon; which said exceptions in a certain bill were then and there written down, and the said judges did then and there put their seals to the aforesaid bill, according to the form of the statute in such case made and provided. And the said John Fox, by his attorney aforesaid, brings here into court, before the justices of the said Supreme Court, the bill of exceptions aforesaid, with the seals of the said judges put and affixed to the said bill; therefore the said John Fox saith, that in the record, proceedings, trial, and judgment aforesaid there is manifest error.

And the said John Fox, by his attorney aforesaid, further in fact says, that at the said court held at New Brunswick aforesaid, on the day and year aforesaid, before the judges of the said court in the record aforesaid above mentioned, on the trial of the indictment aforesaid in the record aforesaid set forth, certain exceptions on the behalf of the said John Fox, by his counsel, were taken and made to the decision and opinion of the said court by the said judges then and there pronounced and declared, by which opinion the said judges then and there declared, pronounced, and decided that Ellis Waite, a person then and there called as a juror for the trial of the said indictment, and who, after he was called, and before he was sworn as such juror, was challenged by the said John Fox, then and there present in court, to the favor, could not be then and there sworn and examined by the said John Fox in reference to the indifference of the said Ellis Waite in the said cause, although two triers were then and there appointed and sworn by the said court for the purpose, and although the said John Fox then and there proposed and offered the said court to have the said Ellis Waite sworn, and to put the following question to the said Ellis Waite : "Have you formed or expressed an opinion of the guilt of the prisoner at the bar of the crime charged in the indictment ;" and the said judges did then and there refuse to allow the said Ellis Waite to be sworn, and did then and there refuse to allow the said question to be put to the said Ellis Waite : and the said Ellis Waite was thereupon then and there sworn and empannelled as a juror for the trial of the said indictment, and issue joined thereon ; which said exceptions in a certain bill were then and there written down, and the said judges did then and there put their seals to the aforesaid bill, according to the form of the statute in such case made and provided.  And the said John Fox, by his attorney aforesaid, brings here into court, before the justices of the said Supreme Court,

the bill of exceptions aforesaid, with the seals of the said judges put and affixed to the said bill : therefore the said John Fox saith, that in the record, proceedings, trial and judgment aforesaid there is manifest error.

And the said John Fox, by his attorney aforesaid, further in fact says, that at the said court held at New Brunswick aforesaid, on the day and year aforesaid, before the judges of the said court, in the record aforesaid above mentioned, on the trial of the indictment aforesaid, in the record aforesaid set forth, certain exceptions on the behalf of the said John Fox, by his counsel, were taken and made to the decision and opinion of the said court, by the said judges then and there pronounced and declared, by which opinion the said judges then and there declared, pronounced, and decided, that the evidence of Clifford Morrogh, a witness then and there produced and sworn on the part of the state, in reference to wounds upon the person of the deceased John Henry, other than the wound upon the throat of the said deceased, could be received in evidence; and the said judges did then and there receive the same in evidence, although the same was then and there excepted to by the said John Fox, and did then and there refuse to overrule the same, although then and there moved so to do by the said John Fox; which said exceptions in a certain bill were then and there written down, and the said judges did then and there put their seals to the aforesaid bill, according to the form of the statute in such case made and provided.    And the said John Fox, by his attorney aforesaid, brings here into court the bill of exceptions aforesaid, with the seals of the said judges put and affixed to the said bill : therefore the said John Fox saith, that in the record, proceedings, trial, and judgment aforesaid there is manifest error.

And the said John Fox, by his attorney aforesaid, further in fact says, that at the said court, held at New Brunswick aforesaid, on the day and year aforesaid, before the

judges of the said court, in the record aforesaid above mentioned, on the trial of the indictment aforesaid in the record aforesaid set forth, certain exceptions on the behalf of the said John Fox, by his counsel, were taken and made to the decision and opinion of the said court, by the said judges then and there pronounced and declared, by which opinion the said judges then and there declared, pronounced, and decided that a certain model, produced on the part of the state, and then and there offered in evidence on the part of the state, should be received in evidence, and was then and there received in evidence by the said court, although then and there excepted to by the said John Fox; which said exceptions in a certain bill were then and there written down, and the said judges did then and there put their seals to the aforesaid bill, according to the form of the statute in such case made and provided. And the said John Fox, by his attorney aforesaid, brings here into court the bill of exceptions aforesaid, with the seals of the said judges put and affixed to the said bill: therefore the said John Fox saith, that in the record, proceedings, trial, and judgment aforesaid there is manifest error.

And the said John Fox, by his attorney aforesaid, further in fact says, that at the said court, held at New Brunswick aforesaid, on the day and year aforesaid, before the judges of the said court in the record aforesaid above mentioned, on the trial of the indictment aforesaid in the record aforesaid set forth, certain exceptions on the behalf of the said John Fox, by his counsel, were taken and made to the decision and opinion of the said court, by the said judges then and there pronounced and declared, by which opinion the said judges then and there declared, pronounced, and decided, that certain conversations had between divers persons and Matilda Spencer, a witness then and there produced and sworn on the part of the state, could be received as evidence in the said cause, and

the said judges did then and there receive the said conversations as evidence on the trial of the said indictment, although the same were then and there excepted to by the said John Fox ; which said exceptions in a certain bill were then and there written down, and the said judges did then and there put their seals to the aforesaid bill, according to the form of the statute in such case made and provided, And the said John Fox, by his attorney aforesaid, brings here into court the bill of exceptions aforesaid, with the seals of the said judges, put and affixed to the said bill : therefore the said John Fox saith, that in the record, proceedings, trial, and judgment aforesaid, there is manifest error.

And the said John Fox, by his attorney aforesaid, further in fact says, that the said court, held at New Brunswick aforesaid, on the day and year aforesaid, before the judges of the said court, in the record aforesaid above mentioned, on the trial of the indictment aforesaid in the record aforesaid set forth, certain exceptions on the behalf of the said John Fox, by his counsel, were taken and made to the charge of the said court, then and there given and delivered to the said jury empannelled and sworn to try the said indictment, in that the said charge was in divers respects, then and there particularly specified and pointed out, unlawful ; which said exceptions in a certain bill were then and there written down, and the said judges did then and there put their seals to the aforesaid bill, according to the form of the statute in such case made and provided. And the said John Fox, by his attorney aforesaid, brings her into court the bill of exceptions aforesaid, with the seals of the said judges put and affixed to the said bill : therefore, the said John Fox saith, that in the record, proceedings, trial, and judgment aforesaid there is manifest error.

Wherefore he prays the judgment of the court here in the premises, and that the judgment aforesaid, for the

errors aforesaid, and other errors in the record and proceedings aforesaid found and being, may be reversed, annulled, and held as entirely void, and that the court here may proceed to the examination, as well of the record and proceedings aforesaid as of the matters above, for error assigned, &c.

ABM. V. SCHENCK,

Attorney for and of counsel with the defendant, John Fox.

To which said assignment of errors the common joinder in error was filed in behalf of the state.

The cause was argued on the 30th of June, before the CHIEF JUSTICE, and OGDEN, POTTS, HAINES, and VREDENBURGH, Justices.

Schenck, for defendant.

I. Three questions arise under the first bill of exceptions, viz. 1. Whether, under the constitution and laws of this state, a man who has formed and expressed an opinion on the guilt or innocence of the defendant, or who, in other words, has prejudged the cause, can be held to be an impartial juror. 2. Whether a man who is returned, and called to be sworn as a juror, when challenged by the accused for cause, can be sworn as a witness for the accused. 3. Whether the party challenged can be asked on his *voir dire*, by the accused, whether he has formed and expressed an opinion of the guilt of the accused.

The defendant was denied an impartial jury, which is guarantied to him by the constitution, as well as by law. *Constitution, Art. I,* § 8 ; *Co. Lit.* 155, *a, b* ; *Hawk. B.* 2, *ch.* 43, § 28 ; 1 *Salk.* 153 ; *Trials per pais* 74, 132 ; *Bac. Ab. "Juries "* 5 ; 3 *Burns' J.* 110, *"Jurors "* § 4 ; 1 *Archb. Pr.* 206 ; 2 *Green* 201.

It was settled, at the date of the American revolution that the juror, having expressed an opinion upon the guilt of the accused, was a principal cause of challenge, without affirmative proof of the existence of malice or ill will. So

is the great preponderance of authority in this country.
*Burr's Trial* 369, 398, 402, 414, 416, 419 ; 7 *Cranch.* 290 ;
3 *Dall.* 515 ; 1 *Bald.* 78 ; *Wharton's Cr. L.* 844 ; 7 *Cowen*
108 ; 4 *Wend.* 229 ; 21 *Wend.* 509 ; 1 *Denio* 281 ; 4 *Denio*
1 ; 13 *New Hamp.* 491 ; 13 *Mass.* 221 ; 16 *Pick.* 153 ; 14
*Serg. & R.* 292 ; 2 *Harring.* 529 ; 11 *Leigh* 657 ; 2 *Dev. &
B.* 196 ; 3 *Stew. & P.* 308 ; 1 *Walk.* 392, 318 ; 4 *Blackf.*
106 ; 3 *Scam.* 78, 88, 414 ; 1 *Kelly* 222 ; 5 *Georgia* 85 ; 1
*Morris* 382.

The decision in *The State* v. *Spencer* is against the weight
of authority, against the express decision of this court in
*Mann* v. *Glover,* 2 *Green* 201, and against the constitution
of this state, which guarantees an impartial jury. Impar-
tiality means free from bias in favor of one party more
than another. The law presumes every man to be inno-
cent until proved to be guilty. The rule in *Spencer's case*
shifts the *onus,* and requires the accused to establish his in-
nocence.

The right of challenging every one upon the panel who
is not *omni exceptione major,* which includes every one
who is not free from the suspicion of bias or partiality, is a
valuable right, and should be strictly guarded. 1 *South.* 71 ;
*Wharton's Cr. L.* 843.

The juror challenged may be examined as a witness for the
accused.   *Wharton's Cr. L.* 859 ; 3 *Bac. Ab. "Juries"* 267.

The witness may be asked such questions as do not tend
to his infamy or disgrace. The accused was entitled to
have the witness sworn, and to have the opinion of the court
upon the competency of the question asked, 1 *Denio* 281 ;
1 *Robinson* 735.

We had a right to lay the foundation of the challenge by
one witness, and to perfect it by others. 4 *Denio* 12, 33.

The party challenged may be asked, upon his *voir dire,*
whether he has formed and expressed an opinion of the
guilt of the accused. 1 *Chit. Cr. L.* 547, 550 ; *Wharton's
Cr. L.* 861 ; *Co. Litt.* 484 ; *Trials per pais* 136, 153.

A question tending to the disgrace or infamy of the

witness may be asked, though he may not be bound to answer. 1 *Stark. Ev.* 197 ; 1 *Greenl. Ev.* § 460 ; 6 *Cowen* 259.

Admitting the decision upon this point in the case of *The State* v. *Spencer* to have been correct, the rule has since been altered by legislative authority. *Nix. Dig.* 888, § 3, 4.

By the statute, it is enacted that a witness shall not be excused from answering any questions relevant and material to the issue, provided the answers will not expose him to a criminal prosecution or penalty, or to a forfeiture of his estate. Here there was an issue, *viz.* whether the juror was indifferent between the parties ; the question was relevant and material to the issue, and the answer of the witness could not subject him to any penalty or forfeiture.

II. The court erred—1st, in not allowing the juror to be sworn ; 2, in overruling the question propounded. If the objection was not good as a principal challenge, it was a good challenge to the favor. *Wharton's Cr. L.* 858.

III. The court erred in admitting evidence of other injury to the deceased than that charged in the indictment. The indictment charges, that the death was occasioned by a knife or razor, with which the defendant cut or struck the throat of the deceased, inflicting a wound, of which he died. The evidence should have been restricted to that injury alone. 1 *Greenl. Ev.* § 51 ; 2 *Stark. Ev.* 710.

IV. The court erred in admitting in evidence a model of certain wounds inflicted on the deceased. The evidence was offered upon a re-examination of the witness in chief. Not being rebutting testimony, it was incompetent in point of time. 2 *Zab.* 516 ; 1 *Stark. Ev.* 208 ; 1 *Greenl. Ev.* § 467. It was incompetent, moreover, because it was not proved that the model was correct.

V. The court erred in admitting evidence of the conversations of third persons with Matilda Spencer, one of the witnesses in the cause. 6 *Cowen* 682 ; 2 *Zab.* 516.

*Vandyke* and *Vroom*, for the state.

That clause of the constitution requiring that trials shall be by an impartial jury, is a mere affirmance of the common law.

Challenge must show a clear qualification. All the facts necessary to constitute a good ground of challenge must be averred and proved. The whole ground of challenge averred was that the juror had formed and expressed an opinion in the case. If clearly proved it would have been immaterial. The rule is settled, at least in this state. *State* v. *Spencer*, 1 *Zab.* 196; *Joy on Challenges* 189, 201, 207.

The act concerning evidence (*Nix. Dig.* 888) applies only to causes at issue. It has no relation to challenges, where there is properly speaking no issue.

There was no evidence in the cause that the death resulted from any other cause than that charged in the indictment. There was, therefore, no want of correspondence between the allegation and the proof.

If the court erred in any matter which did not prejudice the defence upon the merits, it constitutes no ground of reversal. *Nix. Dig.* 189, § 45.

*H. V. Speer*, in reply, insisted upon two propositions, *viz.:*

1. That a juror declaring his opinion beforehand, is in itself a good cause of principal challenge.

2. That the juror may himself be examined to prove the challenge.

In support of these positions, he cited *Brooke's Ab.* " *Challenge* " 25, 150; 21 *Viner's Ab.* " *Trial* " *I, d*; *Brook's Ab.* " *Challenge* " 25, 90; 2 *Hawk. Ch.* 46, § 29; *Bulstrode* 21; 1 *Keble* 71, § 41; 11 *Petersd. Ab.* 544; *Salk.* 648; 13 *Howell's St. Tr.* 183; *Joy* 195; 1 *Arch. Pr.* 183; 2 *Tidd's Pr.* 853; *Bull. N. P.* 307; *Bac. Ab.* " *Juries* " *E,* 5; 1 *Johns. R.* 316; *Burr's Trial* 3; *Da l.* 561; 6 *Cowen* 565; 7 *Cowen* 111, 123; 7 *Cranch* 290; *Baldwin's R.* 78, 84; 3 *Stewart* 454; 2 *Virg. Cas.* 297,

State v. Fox.

371; *Kirby* 13; 5 *Rand.* 659; 2 *Leigh* 769; 9 *Pick.* 496; 11 *Wend.* 131; 2 *Blackf.* 114; 1 *Conn.* 401; 3 *Blackf.* 155; 17 *Pick.* 395; 3 *Leigh* 780; 5 *Leigh* 707; 1 *Rob.* 735; 9 *Leigh* 761; 7 *Ala.* 135; 7 *Porter* 187; 5 *Howard* (*Miss.*) 730; 3 *Humphrey* 375; 7 *Iredell* 61; 5 *Cushing* 295; 7 *Grattan* 593; 18 *Metc.* 166; 3 *Kelly* 453; 16 *Ohio* 364; 13 *Sme. & Mar.* 189, 500; 1 *Iowa* 534; 19 *Ohio* 198; 10 *Humphrey* 456; 13 *Illinois* 685.

The CHIEF JUSTICE delivered the opinion of the court.

This case comes before the court upon bills of exceptions sealed, on the trial of an indictment for murder in the Middlesex Oyer and Terminer, at the term of April, 1856.

On the trial of the indictment, John Gordon, on being called as a juror, was challenged by the defendant, "for that he, the said John Gordon, had prejudged the cause." Whereupon the defendant proposed to have the said John Gordon sworn, and to put to him the following question: "Have you formed *and* expressed an opinion of the guilt of the prisoner at the bar of the crime with which he stands charged in the indictment." The court overruled the offer, and this decision forms the ground of the first bill of exceptions.

Ellis Waite, on being called as a juror, was challenged to the favor, and triers were appointed to try whether he stood indifferent between the state and the prisoner. Whereupon the defendant proposed to have the juror sworn, and to put to him the following question: "Have you formed *or* expressed an opinion of the guilt of the prisoner at the bar of the crime charged in the indictment." The offer was overruled, and no other evidence being offered on the part of the defendant, the triers found the said Ellis Waite indifferent between the parties, and he was sworn as a juror in the cause. This constitutes the ground of the second bill of exceptions.

The errors assigned upon these exceptions present for consideration two questions, *viz :*

1. Whether a juror declaring his opinion beforehand of the guilt of the prisoner of the crime with which he stands charged, is in itself a good cause of challenge.

2. Whether the juror himself may be examined to prove the existence of such cause of challenge.

These questions were considered and decided by Chief Justice Hornblower, in the case of *The State* v. *Spencer*, in the Hudson Oyer and Terminer, at August term, 1846. (1 *Zab.* 196.) In that case, the Chief Justice said : " A principal challenge *propter affectum* 'is founded, amongst other things, on the fact that the juror has declared his opinion of the case beforehand. In order to support such a challenge, it must appear that the opinion expressed was out of ill will or malice towards the party. It has been supposed that an opinion of guilt, founded on newspaper reports or other information, or on personal knowledge, disqualifies a man from being a juror. But this is not so. It has been solemnly decided by our own Supreme Court, in *Mann* v. *Glover*, 2 *Green*, 195, that a hypothetical opinion, founded on the supposition that the facts detailed are true, is no cause of challenge. And I have no hesitation in saying, that a bystander, who witnesses a homicide or any other breach of the peace, is a perfectly competent juror. A declaration of opinion to disqualify a juror, therefore, must be such a one as implies malice or ill will against the prisoner, thereby showing that the person challenged does not stand indifferent between the state and him."

" As to the mode of proving a challenge, the law of evidence is the same as in other cases. Proof may be made by records, papers, or witnesses, either to support the challenge or to disprove it. The juror himself may be examined as to his statutory qualifications or any other matter not going to his dishonor or discredit. But it has

been repeatedly decided that it does go to his discredit to ask him if he has formed or expressed an opinion on the matter in issue, or that the prisoner is guilty. For as this is no ground of challenge, unless expressed in such a manner as to evince malice or ill will towards the prisoner, it would be great injustice to the juror, and a legal impropriety which the court should not tolerate, to compel him, by his own testimony, to convict himself of what the law deems disreputable conduct. I know that this practice has been suffered on former occasions by my brethren on the bench, as well as by myself; but it was an unauthorized departure from the rules of the common law, and yielded to under the pressure of high judicial examples in other states."

This opinion is thus fully stated, because it contains, in clear and emphatic terms, an express decision of both the questions raised upon these bills of exceptions, and covers the whole ground now in controversy. It is entitled to our most respectful consideration, not only from the learning of its author, but from the circumstances under which it was pronounced, and from the practical results of its application. Though delivered in the Oyer during the progress of an important trial, it was not formed during the haste of the trial, but was pronounced upon full and mature deliberation. It materially qualified the opinion previously expressed by the same learned judge in *Mann* v. *Glover*. It conflicted with the practice which had previously prevailed to some extent in this state, and which, on former occasions, had been sanctioned by the Chief Justice himself. The opinion is understood to have been acquiesced in by his associates on the bench of the Supreme Court. It has since constituted the uniform rule of practice, having been adopted and acted upon throughout the state. It is believed to have met the very general approval of the profession. While its adoption has avoided much delay and embarrassment in the empannelling of

juries, it has not been found to operate prejudicially to the rights of the defendants. The most unequivocal proof of the truth of this statement is found in the fact, that although the rule has been adopted and applied on the trial of at least thirty capital cases since its adoption in Spencer's case, and, although convictions for murder or for crimes of lower degree have taken place in a large number of these cases, no exception has been taken to the rule, nor has the question been in any way, hitherto, presented for consideration to this court.

A rule which has been thus deliberately adopted by the court, approved by the bar, sanctioned by usage, and found by experience to operate beneficially in the administration of justice, ought not to be disturbed, unless it appear to be manifestly erroneous.

It is insisted, on the part of the defendant, that the rule is a violation of the constitution of this state; that it is a departure from the ancient rule of the common law, and is in derogation of the legal and constitutional rights of the defendant. If the rule be obnoxious to either of these objections, the defendant has been deprived of a fair trial, and the conviction is illegal.

By the constitution of this state, Art. I, § 8, it is provided, that "in all criminal prosecutions the accused shall have the right to a speedy and public trial *by an impartial jury.*" This clause confers upon defendants in criminal cases no new right. It invests with a constitutional sanction what was previously a common law right. Every criminal is entitled at common law to a trial by *an impartial jury.* The question still remains, what constitutes impartiality, or rather what is the test or evidence of that bias or partiality which disqualifies the juror. This must be settled by common law principles.

The question has undergone such repeated and elaborate discussion that no new light can be hoped for, and further discussion would be misplaced. It is proposed simply

to advert to some of the leading cases in the books, and to state briefly the grounds on which the decision must r t.

In the *Year Book*, 7 *Henry* 6, *fol.* 25, Babington J., in his charge to the triors, says, " if, whether the matter be true or false, he will pass for the one party or the other, in that case he is favorable.    But if a man has said twenty times that he will pass for one or the other, you will inquire, on your oaths, whether the cause be for affection that he has to the party or for the knowledge he has of the matter in issue ; if for affection that he has to the party, then he is favorable, but otherwise not." This opinion clearly places the ground of challenge not upon the mere expression of opinion, but upon the existence of bias or prejudice in the mind of the juror, upon which that opinion may or may not have been founded.

The case of *Peter Cook*, tried for high treason at the Old Bailey, 8 *Will.* 3, (1696) is frequently cited in support of the position, that the mere expression of an opinion by the juror, adverse to the prisoner, is a good cause of challenge. An examination of the case does not warrant that conclusion.    It is true that when the prisoner addressed the court saying, "I am advised that if any of the jury have said already that I am guilty, or they will find me guilty, or I shall suffer or be hanged, or the like, they are not fit or proper men to be of the jury," Treby, Ch. Just., replied, " you say right, it is a good cause of challenge." 13 *Howell's St. Trials* 334.    But when it was proposed to inquire of the juror himself, whether he had expressed such opinion, the question was overruled, on the ground that he could not be asked a question that tended to bring upon him scandal or infamy.    And upon its being suggested that there was nothing scandalous or infamous in the mere expression of an opinion, Treby, Ch. Just., replies, " it seems by what the prisoner says, that he would ask all the jurors whether they have not said that he was

guilty, or that they would find him guilty, or that he should be hanged, or the like, which (presuming him innocent) is to ask, whether they have not defamed or slandered him in the highest degree ; and to force them to discover that *they have a mortal hatred to him, and come with a malicious resolution to convict him;* which, admitting that they are not punishable by our law, yet are things so detestably wicked and so scandalous as are not fit to be required to be disclosed by and against themselves.    *    *    *
I take the question not to be concerning a man's discoursing suppositively, as if, upon hearing news or a report of clear evidence, a man should say, supposing this to be true, such a man is guilty, and I should find him so, if I were of his jury.   This might not be sufficient to set aside a juror. For this has been a general discourse among the subjects upon occasion of this conspiracy ; and it imports that if evidence should not be true and clear he would acquit him. And so he is, as he should be, indifferent.   But if a man qualified for a juror affirms positively that such a man is guilty, and that he will find him so, whatever evidence or proof be given or made to the contrary, I think that may be a misdemeanor, punishable as an owning and encouraging of falsehood, perjury, and injustice, and a contempt and scandal to the justice of the kingdom."   It is very obvious that something more was in the contemplation of the court than vague impressions or opinions founded upon knowledge or general rumor, free from the promptings of actual malice or ill will.

In *Hawk. P. C., B.* 2, *ch.* 43, § 28, it is said, " It hath been allowed a good cause of challenge on the part of the prisoner, that the juror hath declared his opinion before hand that the party is guilty, or will be hanged, or the like. Yet it hath been adjudged that if it should appear that the juror made such declaration from his knowledge of the case, and not out of any ill will to the party, it is no cause of challenge." *Bacon's Ab.* "*Juries*" *E,* 5.

In 1 *Chitty's Cr. Law* 542, the rule is stated thus : " An *actual partiality* may be shown as well as a supposed bias. Thus, if a juryman has expressed his *wish* as to the result of the trial, or his opinion of the guilt or innocence of the defendant *with a malicious intention*, upon evidence of these facts he will be set aside."

In *The King* v. *Edmonds*, 4 *Barn. & Ald.* 491, Abbott, Ch. Just., in delivering the opinion of the Court of Kings Bench, states the result of the ancient authorities to be, that expressions used by a juryman are not a cause of challenge, unless they are to be referred to something of personal ill will toward the party challenging.

In *Hughes'* case, a juror was challenged *propter affectum*, and triors appointed. A declaration of the juror, on a former trial, having been given in evidence in support of the challenge, Crampton, J., in charging the triors, said. " the mere expression of an opinion, as to the prisoner's guilt or innocence, from any cause but that of malice or ill will, does not, I think, disqualify him ; and if you are of opinion, from the evidence that has been given, that any ill will has been exhibited or entertained towards the prisoner by this man, any partiality or prejudice against him, you should find the issues against the crown ; but if you come to the conclusion that, by the notoriety of the facts stated publicly, and spoken of through the country at large, an opinion has been formed by him without partiality or a particle of ill will against the prisoner, then your verdict should be given for the crown."

And on its being urged by the counsel of the prisoner, that the question submitted to the triors should be, whether the juror had in fact formed any opinion as to the guilt or innocence of the defendant, the judge refused so to charge, saying he did not feel the least doubt on the subject. *Joy on Adm. of Conf. and Chal. of Jurors* 205.

These cases, extending from the reign of Henry VI. nearly to the present time, a period of more than four hundred

State *v.* Fox.

. years, fully sustain the rule adopted in *The State v. Spen-cer*. They show that, by the rule of the common law, the mere expression of an opinon as to the prisoner's guilt or innocence, not arising from malice or ill will, does not disqualify the juror, and that such declaration is in itself no evidence of the existence of malice or ill will.

There are occasional dicta and cases, to be found in the English books, indicating that the mere expression of an opinion unfavorable to the prisioner is in itself a cause of challenge. But that such is not the recognised rule of law, is abundantly evident from the fact, that the question is never suffered to be asked of the juror himself, whether he has expressed such opinion; but the fact must be established by other evidence. The ground of this practice is, that the question tends to bring scandal or infamy on the juror. But if the question is merely designed to prove that the juror has expressed an opinion found on his knowledge of the case, or from having read or heard the evidence, or from common rumor, unconnected with any feeling of malice or ill will, it can by no possibility involve any degree of infamy, reproach, or moral turpitude. The rule of evidence applicable to the proof of the cause of challenge affords the strongest evidence of what the ground of challenge really is.

It is worthy of notice, moreover, that the rule excludin; the proof of the cause of challenge by the juror, effectually excludes all challenges on the ground that the juror has *formed* opinions unfavorable to the prisoner, if they have not been expressed so as to be capable of proof by others. But if the mere opinion of the defendant's guilt would disqualify the juror, it is *entertaining* the opinion, not the *expression* of it, that constitutes the real ground of objection. The expression merely furnishes evidence of the existence of the opinion.

It appears, therefore, as well from the practice of the courts as from the adjudicated cases, that by the rule of

the common law, as adopted and understood in England, the fact that the juror has formed or expressed an opinon unfavorable to the defendant, does not in itself constitute a good cause of challenge.

In most of the American courts there has been a departure more or less wide from the rule of the common law, which is sustained by much force of argument, and sanctioned by eminent judicial authority. We nevertheless believe that the common law rule rests upon sound principle, and that neither reason or policy require that it should be abandoned.

A principal challenge rests in express favor or express malice. *Co. Litt*, 157, *a*. The actual existence of the malice may be proved, or it may be implied in law, from the situation, the relations, or the acts of the juror. The question at issue supposes the absence of all actual malice, and the only question is, whether the law will imply malice from the mere expression of opinion, founded on a knowledge of the facts or upon information supposed to be true. Legal implications are grounded on reason and experience; but neither reason or experience will warrant the conclusion that such expression of opinion involves ordinarily, much less of necessity, the existence of malice. And by malice, we mean that state of mind, favorable or unfavorable, which resists the influence of truth, and prevents a decision of the cause, according to the weight of the evidence, without bias. On the contrary, the formation or expression of an opinion under such circumstances is perfectly compatible with the indifference of the juror, in the legal sense of that term. The very terms of the challenge, *propter affectum*, for affection, imply a moral bias, partialty, or prejudice. A mind heated by passion, excited by controversy, or inflamed by party strife, labors under a moral bias. Where this is proved to exist, the challenge may be sustained. But knowledge is not prejudice. Wherever there is knowledge, from the

very nature of the human mind, there must be opinion, and the strength of the opinion will ordinarily be proportioned to the extent of the knowledge. In a community like ours, where intelligence of every kind is widely diffused, rapidly circulated, and eagerly sought after, to affirm that every one who acquires information of a crime, and forms, as every man capable of thought must form, some opinion in regard to it, is laboring under a moral bias which perverts the judgment, is to affirm what is contrary to all reason and experience, and in direct conflict with the truth. The doctrine, carried to its legitimate conclusions, excludes the most intelligent class of citizens, and those best qualified to serve as jurors. It practically disqualifies every man who reads and thinks. Instead of purifying, it emasculates the jury box; and where the experiment has been fully tried, the lessons of experience have in this particular confirmed the deductions of reason. There may be minds so constituted that every ray of light necessarily produces obliquity of vision. But that is not the normal condition of the mind, and it cannot be wise to predicate a legal principle upon a mere anomaly.

In examining this question, much stress has been laid upon the fact, that it is a good cause of challenge that a juror has previously tried the same cause, or rendered a verdict upon the same question. The cases are not analogous. The juror who has once tried the case is rejected, not on the mere ground that he has formed or expressed an opinion, but because he has officially examined, and under the sanction of an oath decided, the guilt or innocence of the prisoner. This solemn decision the law presumes is final, and that the mind is closed against a reexamination. With some qualifications, the same principle applies to the case of a grand juror who sat on the inquest. That the formation of an opinion is not the ground of challenge, is evident from the fact that it is no cause of challenge that the juror has tried and convicted another

defendant charged in the same indictment with the prisoner.

But it is said that the law demands perfect impartiality, and will not tolerate the least bias in a juror. The law does not ask impossibilities. A juror who is acquainted with either of the parties in the cause, and knows the character of either to be good or bad, or who has ever thought of the principle involved in the controversy, may be said to have some bias; but it is not that bias which the law condemns. It neither blunts the perceptions nor perverts the judgment. The purity of the jury box will be effectually preserved by excluding those whose opinions are prompted by actual malice, or rest upon deliberate conclusions formed and expressed under the sanction of an oath, in the performance of official duty.

The decisions in the American courts upon this point have been very extensively influenced by the case of Burr. The very eminent character of the learned judge before whom that case was tried has deservedly given great weight to his opinions. But no stronger illustration can be adduced of the impracticability of the rule adopted in the case of Burr, and of the wisdom of the ancient rule of the common law, than is afforded by that case itself. The case had occasioned deep and widespread popular feeling, which continued down to the time of the trial. In the earlier stages of the trial, the court appear to have been disposed to limit the objection to those jurors, who had formed and expressed opinions that the defendant was guilty of the crime charged in the indictment, and to make the strength or weakness of the opinion the test of qualification. But, in the progress of the cause, this ground appears to have been virtually abandoned, and the cause of disqualification to have been placed on the broadest possible ground. Every juror challenged was rejected. Of the first panel of forty-eight, only four were sworn. Of those rejected, some had formed and expressed opinions

of the prisoner's guilt, others entertained strong prejudices against him, but several were rejected who believed that the prisoner entertained treasonable designs, but who had neither formed nor expressed any opinion of his guilt or innocence of the crime charged. *Burr's Trial (Carpenter's Report)* 11 to 67.

On the second panel returned, but few jurors were challenged, although many expressed opinions of the prisoner's guilt, quite as decided as any of those who were rejected.

Christopher Anthony, one of the panel, said he had declared to an intimate friend that he came with the hope of being put on the jury, and if he was, that he would hang Burr without any ceremony. He added, " I should be very unwilling to serve on the jury, because I consider myself disqualified, and thinking so because the rule had disqualified others who held the same opinion with me." *Ibid* 70. The juror said, it is true, that the expressions used by him were spoken in levity. But when another juror said that his opinions were expressed in joke, the court said they could not indulge jokes on a serious subject, and set aside the juror. *Ibid* 27.

John M. Shepperd (another juror called) said, " he conceived himself disqualified to pass between the prisoner and the country, as he had fully made up his mind, particularly from the deposition of General Eaton. He had believed that the prisoner had intentions hostile to the peace and safety of the United States, and he still believed it; and that he would at any time have overthrown the government, if he had had it in his power. It would be inflicting a wound to his own bosom if he was to be compelled to serve. This was his most serious impression." *Ibid* 72. Miles Botts (another juror) said, " from the affidavits of General Wilkinson and General Eaton, my opinion was completely made up and delivered, at different times, several months ago ;" and in answer to a

question of the defendant's counsel, the juror added, " I have made my mind up so far as to say that Colonel Burr ought to be hung." Neither of these jurors were chal- lenged. On the contrary, it is evident, from the report, that the defendant and his counsel desired that they should serve. We have here the remarkable spectacle of a defendant charged with a crime of the highest magni- tude, assisted by the ablest counsel, himself an acute and practised lawyer, spending days in purging the jury box of every man who entertained an unfavorable opinion, and then passing without challenge jurors who declared that they had formed and expressed the most deliberate opinions of the prisoner's guilt of the crime with which he was charged.

A satisfactory solution of this apparent anomaly will be found in a remark of the prisoner, when the first panel was exhausted, and the court were about to award a *tales*. " Mr. Burr said, he trusted that when the officer of this court should be inclined to seek for impartial men, they would be found; he could scarcely think that accident had thrown into this panel forty-seven out of forty-eigh' men *of a particular train of principles.*" The *real* ground of challenging the jurors on the first panel was not that they had formed or expressed opinions of the guilt of the defendant, but that they were men of a *particular train of principles*, and the jurors on the second panel were not challenged, although they had formed and expressed th : most decided opinions of the prisoner's guilt, because they were men of another and different train of principles. The real objection to the jurors, in the mind of the pris- oner and his counsel, was not the mere formation or expres- sion of opinions of his guilt, but it was some train of prin- ciples, some previous habit of thought or prejudice, lying back of those opinions, which it was feared would bias the mind and warp the judgment of the juror.

We are of opinion that the mere formation or expression

of an opinion is not of itself a ground of challenge ; that the ruling in Spencer's case is supported by authority, by principle, and by considerations of sound public policy, and ought not to be disturbed.

The *second* question presented for consideration is, whether the juror himself may be examined as a witness to prove the alleged cause of challenge.

The juror challenged is clearly a competent witness to prove any ground of disqualification not involving his personal character. The only ground upon which his evidence has been excluded is, that he shall not be called on to testify to his own disgrace. This objection, as applicable to witnesses generally, is removed by the fourth section of the act of April 5, 1855, (*Nix. Dig.* 888, § 4), by which it is enacted, that a witness shall not be excused from answering any question relevant and material to the issue, provided the answers will not expose him to a criminal prosecution or penalty, or to a forfeiture of his estate. No reason is perceived why a juror, sworn to testify upon the issue of his own competency, is not within the operation, as he is clearly within the letter of this enactment. The statute operates to alter the common law rule, that a juror shall not be examined as to any disqualification tending to his own disgrace. Upon this point, the rule adopted in *The State* v. *Spencer* is superseded by the statute. It is hence insisted that the court below erred in not permitting the juror to be sworn.

By the record, it appears that the defendant proposed to have the juror sworn, and to propound to him the following questions, *viz :* " Have you formed and expressed an opinion of the guilt of the prisoner at the bar of the crime with which he stands charged." It does not appear that there was any decision by the court upon the simple question of the competency of the juror to testify to his own disqualification, or that that point was presented for consideration. The offer was to swear the juror, and to

proposes o him a particular question. That offer the court overruled. The question was in itself immaterial, and there was, therefore, no error in overruling the offer of the defendant. If the fact proposed to be proved constituted no ground of challenge, there was no error in overruling the evidence in support of it

But it is further insisted, that although upon the *principal* challenge the answer of the witness may have been irrelevant, yet upon the challenge *to the favor*, it was competent for the prisoner to offer additional evidence tending to show that the juror was not indifferent; that the question propounded was in itself lawful, and although it might not alone establish the cause of challenge, yet it was one of a series of questions which might have shown, to the satisfaction of the triors, the disqualification of the juror.

But it was not alleged upon the trial, nor is it now suggested, that there was other evidence to be offered, or that it was desired or intended to ask any other question than that propounded to the juror. No other evidence was in fact offered. There was no error in overruling the question in this aspect of the objection, unless other evidence was to be offered. If it was proposed or intended to introduce other evidence, that fact should appear upon the record. It is incumbent upon the party complaining to establish the existence of the alleged error.

But, admitting the existence of technical error in overruling the evidence, the exception affords no ground for reversal. By the act of 1855, which authorizes bills of exceptions in capital cases (*Nix. Dig.* 189, § 45), it is enacted, that no judgment given upon any indictment shall be reversed for any imperfection, omission, defect in, or lack of form, nor for any error, except such as shall or may have prejudiced the defendant in maintaining his defence upon the merits. Inasmuch as the question proposed was in itself perfectly indifferent, and no other evidence was

offered, the error alleged clearly could not have prejudiced the defendant in maintaining his defence upon the merits.

It is proper to add, by way of guarding against misapprehension, that the second challenge was clearly a principal challenge, and not a challenge to the favor. The fact, that it was permitted on the trial, is not to be regarded as sanctioning the right to make such challenge.

The *third* error assigned is, that the court admitted evidence of other injuries to the deceased than those inflicted by cutting his throat, although the indictment charges that death resulted from cutting the throat with a knife or razor. The point of the objection is, that the allegation and proof must correspond, and that the state was permitted, in violation of this rule, to prove a killing by other means than those described in the indictment. The objection is not sustained in point of fact by the record. The evidence is, that the injuries upon the throat by cutting would occasion death very speedily. But there is no evidence that death resulted from the other injuries described by the witness. The state having sustained the charge in the indictment by proof of the injury, as therein alleged, it was competent to show the nature and extent of the injuries inflicted on the deceased. But admitting the objection, as alleged, to be fully sustained by the record, it forms no ground of error. A variance between the indictment and the evidence, as to the instrumental cause of death, is not material, provided the party is proved to have died the same kind of death, (*ex. gra.* by violence or by poisoning) as mentioned in the indictment It is sufficient if the substance of the charge be proved without precise regard to circumstances, and therefore, if the indictment charge that the defendant, with a knife or dagger, gave the mortal wound, and in evidence it appears that he gave the wound with a sword, staff, or bill, the defendant should be convicted. For the substance of the matter is, that the party indicted inflicted a mortal

wound, whereof the deceased died. *Mackalley's case,* 9 *Coke* 67, *a* ; 1 *Gilbert's Ev.* 872 ; 2 *Hawk., cap.* 46, § 37 ; 2 *Hale's P. C.* 185, 291 ; *Arch. Cr. Pl.* 211.

The *fourth* error assigned is, that the court admitted in evidence the model and measurement of certain injuries inflicted on the person of the deceased. It is not denied that the evidence was in itself competent; but it is urged—1st, that it was improperly admitted in point of time; that it was not rebutting testimony, and was offered and admitted after the direct examination was closed and the witness had been cross-examined. The rule is well settled, that the conduct of the trial and the general course of the examination of witnesses rests very much in the sound discretion of the judge, and does not constitute a ground of error. 1 *Greenl. Ev.* § 431, 447. Our practice in this respect has not been strict; and where either party had accidentally overlooked or omitted material evidence, it is usual and proper, in the discretion of the court, to permit the omission to be supplied, even after the adversed party has rested.

It is further objected, that there was no proof that the model produced was a correct model. A model is a copy or imitation of the thing intended to be represented. And when the witness states that he exhibits a *model,* it is to be inferred, in the absence of all proof to the contrary, that the model is correct. If otherwise, the fact should have been shown upon the trial.

The *fifth* and *sixth* errors assigned are, that the court admitted in evidence the conversations of third persons with the witness. The evidence was not offered or admitted to prove the truth of the facts stated to the witness, but merely to show what it was that called the attention of the witness to a fact stated by her, or that fixed the fact in her recollection. Whether the statement of the third person was true or false was perfectly immaterial. The fact, that the communication was made to the

State *v.* Fox.

witness, and not its truth or falsity, was the only material point. The conversations were not *hearsay*, within the proper meaning of that term, but were original and independent facts, and therefore admissible in evidence. 1 *Greenl. Ev.* § 100, 101

There is no error apparent in the record. The judgment must be affirmed.

CITED *in Donnelly* v. *State*, 2 *Dutch.* 492, 496.